Eva HUGHES, Plaintiff,

v.

THE LILLIAN GOLDMAN FAMILY, LLC, et al., Defendants.

No. 00 CIV. 2388(JGK).

United States District Court, S.D. New York.

July 25, 2001.

Rita Sethi, Mary Marsh Zulack, Michael A. Nicodema, Dreier & Baritz LLP, Conrad A. Johnson, New York City, for Plaintiff.

Judith M. Brener, Joan Marie Campbell, Joan M. Campbell, John J. Flynn, III, Goldstein, Zucker & Flynn, John J. Flynn, New York City, for Defendants.

## OPINION AND ORDER

KOELTL, District Judge.

Plaintiff Eva Hughes ("Hughes") brings this action against the Lillian Goldman Family, L.L.C., Lillian Goldman, Solil Management Corp. (collectively the "Solil defendants"),[1] J.M.G. Properties ("JMG"), and Richard Marks ("Marks"). The plaintiff, who is African–American, alleges that the defendants unlawfully discriminated against her in housing because of her race or color in violation of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* (the "Fair Housing Act"), the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("HRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code. § 8–107 *et seq.* ("NYCHRL").

The plaintiff alleges the following six claims: (1) that the defendants violated 42 U.S.C. § 3604(a), N.Y. Exec. Law § 296(5)(a)(1), and N.Y.C. Admin. Code. § 8–107(5)(a)(1) by refusing to rent a dwelling or housing accommodation to the plaintiff because of her race or color (First Cause of Action); (2) that the defendants violated 42 U.S.C. § 3604(b), N.Y. Exec. Law § 296(5)(a)(2), and N.Y.C. Admin. Code. § 8–107(5)(a)(2) by discriminating against the plaintiff in the terms, conditions, or privileges of the rental or lease of a dwelling or housing accommodation because of her race or color (Second Cause of Action); (3) that the defendants violated 42 U.S.C. § 3604(d) and N.Y. Exec. Law § 296(5)(c)(1) by, among other things, representing to the plaintiff because of her race or color that a dwelling or housing accommodation was not available for inspection or rental when such a dwelling was in fact so available (Third Cause of Action); (4) that the defendants violated 42 U.S.C. § 3605, N.Y. Exec. Law § 296(5)(c)(1), and N.Y.C. Admin. Code. § 8–107(5)(c)(1) by, among other things, discriminating against the plaintiff in making available a residential real estate-related transaction, or in the terms or conditions of such a transaction, because of race or color (Fourth Cause of Action); (5) that JMG has violated N.Y. Exec. Law § 296(8) by violating the terms of a Pre–Determination Conciliation Agreement and Order after Conciliation entered into between the plaintiff and JMG and ordered by the New York State Division of Human Rights (the "Conciliation Agreement") (Fifth Cause of Action); and (6) that JMG fraudulently induced the plaintiff to enter into the Conciliation Agreement rendering the agreement null and void (Sixth Cause of Action).

Three motions are now pending before the Court:

1. Defendant JMG moves to dismiss the Amended Complaint pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted or for summary judgment pursuant to Fed. R.Civ.P. 56; to dismiss the Amended Complaint on the grounds that the plaintiff is estopped by the Conciliation Agreement from pursuing her claims; and, in the alternative, to strike from the Amended Complaint all damages as demanded as to JMG, and to limit any damages against JMG to those for violation of the Conciliation Agreement.

2. Defendant Marks moves to dismiss the Amended Complaint pursuant to Fed. R.Civ.P. 12(c).

3. The Solil defendants move for summary judgment pursuant to Fed.R.Civ.P. 56.

## I.

The same standards apply to a Rule 12(c) motion for judgment on the pleadings

---

**1.** Solil Management Corp., when referred to by itself, is referred to as "Solil."

and to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999); *Narvarte v. Chase Manhattan Bank, N.A.,* 969 F.Supp. 10, 11 (S.D.N.Y.1997). The Court "must view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994); *see also Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989); *National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Labs.,* 850 F.2d 904, 909 n. 2 (2d Cir.1988) (indicating that the Court treats a motion for judgment on the pleadings as if it were a motion to dismiss); *Slavsky v. New York City Police Dep't,* 967 F.Supp. 117, 118 (S.D.N.Y.1997), *aff'd,* 159 F.3d 1348 (2d Cir.1998). A court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. *See Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (citing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding the motion, the Court can consider documents referenced in the complaint and documents that are in the plaintiff's possession or that the plaintiff knew of and relied on in bringing suit. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991); *Skeete v. IVF America, Inc.,* 972 F.Supp. 206, 208 (S.D.N.Y.1997).

The standard for granting summary judgment is also well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference

could be drawn in favor of the nonmoving party, summary judgment is improper. *See Chambers·v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

## II.

The following facts are not in dispute, except as otherwise indicated.[2] The plaintiff is an African–American woman. Marks is a licensed real estate sales agent employed by JMG, which is a real estate brokerage company engaged in renting residential apartments in Manhattan, New York. (Solil Defs.' 56.1 St. ¶¶ 1, 4; Pl.'s Solil 56.1 Counter–St. ¶¶ 1, 4; Affidavit of Joan M. Campbell dated July 17, 2000 ("Campbell Aff."), ¶¶ 2–3.) Lillian Goldman and the Lillian Goldman Family L.L.C. are the owners and landlords of a building at 145 West 55th Street, New York, New York ("145 West 55th Street"). (Solil Defs.' 56.1 St. ¶ 6; Pl.'s Solil 56.1 Counter–St. ¶ 6.) Solil is a New York State corporation engaged in the business of real estate management and participates in the management and rental of 145 West 55th Street. (Am.Compl.¶ 7.)

On March 30, 1998, the plaintiff called JMG in response to an advertisement in the March 18, 1998 issue of Loot Magazine advertising "best deal in town, 1 bedroom, doorman building new renovation, over 700 sq. ft., full services, in west 50's." (Solil Defs.' 56.1 St. ¶ 2; Pl.'s Solil 56.1 Counter– St. ¶ 2; Affidavit of Eva Hughes sworn to August 10, 2000 ("Hughes Aff."), Ex. A.) The Loot advertisement provided a telephone number, and directed interested parties to call Marks at JMG. (Solil Defs.' 56.1 St. ¶ 3; Pl.'s Solil 56.1 Counter–St. ¶ 3; Hughes Aff. Ex. A.) During a tele-phone conversation between the plaintiff and Marks, Marks told the plaintiff that the advertised apartment was 12A at 145 West 55th Street ("12A"), and that the plaintiff should see the building superintendent if she was interested in seeing 12A. (Solil Defs.' 56.1 St. ¶ 5; Pl.'s Solil 56.1 Counter–St. ¶ 5.) The plaintiff alleges that Marks also informed her that the rent for 12A was $900 per month. (Hughes Aff. ¶ 5.)

That same day, the plaintiff went to 145 West 55th Street and found the superintendent who showed her 12A. (Solil Defs.' 56.1 St. ¶ 7; Pl.'s Solil 56.1 Counter–St. ¶ 7.) When the plaintiff asked the superintendent whether there were any other vacant apartments in the building, the superintendent showed her apartment 6G ("6G"). (Solil Defs.' 56.1 St. ¶ 8; Pl.'s Solil 56.1 Counter–St. ¶ 8.) The superintendent allegedly told the plaintiff that she could rent 6G for $600 per month. (Hughes Aff. ¶ 7.) Later that day, the plaintiff telephoned Marks to tell him that she was interested in renting 12A. (Solil Defs.' 56.1 St. ¶ 9; Pl.'s Solil 56.1 Counter–St. ¶ 9.) Marks told the plaintiff to come to JMG's office to fill out an application and to bring with her a recent pay stub, a letter of employment, and identification. Marks also told the plaintiff that Marks would need to run a credit check. (Solil Defs.' 56.1 St. ¶ 10; Pl.'s Solil 56.1 Counter–St. ¶ 10.) The plaintiff alleges that she told Marks that her current lease expired on April 30, 1998, and that she wanted to move in on May 1, 1998 and that Marks said that would be fine. (Hughes Aff. ¶ 9.)

---

**2.** The plaintiff's Local Rule 56.1 Statement in response to JMG's motion is referred to as "Pl.'s JMG 56.1 Counter–St." and her Supplemental 56.1 Statement in response to JMG's motion as "Pl. Supp. 56.1 Counter–St." JMG's Supplemental Statement of Facts is referred to as "JMG's Supp. 56.1 St." The plaintiff's Local Rule 56.1 Statement in response to the Solil defendants' motion is referred to as "Pl.'s Solil 56.1 Counter–St." The Solil Defendants Local Rule 56.1 Statement is referred to as "Solil Defs.' 56.1 St."

On March 31, 1998, the plaintiff went to JMG's office where she met Marks for the first time and filled out an application. (Solil Defs.' 56.1 St. ¶ 11; Pl.'s Solil 56.1 Counter–St. ¶ 11; Hughes Aff. Ex. B.) The plaintiff alleges that Marks looked shocked when he saw the plaintiff in person. (Hughes Aff. ¶ 10.) The Solil defendants allege that the application form for the apartment filled out by the plaintiff was provided and created by JMG. (Solil Defs.' 56.1 St. ¶ 11.) The parties dispute whether the application was then faxed to Solil. (Solil Defs.' 56.1 St. ¶ 12; Pl.'s Solil 56.1 Counter–St. ¶ 12.)

The plaintiff alleges that on April 1, 1998, she called JMG three times. On the first occasion, the plaintiff was allegedly told that Marks was not in. On the second occasion, Marks allegedly answered the telephone and requested that the plaintiff call him back at about 6:15 p.m. On the third occasion, at approximately 6:15 p.m., the plaintiff allegedly spoke to Marks, introduced herself as Eva Hughes, and informed Marks that she was calling about 12A. Marks allegedly asked the plaintiff the maximum amount of money she was willing to spend to rent 12A. The plaintiff allegedly indicated that she was willing to spend up to $1,200.00 per month and Marks told the plaintiff to call back the next day. (Hughes Aff. ¶¶ 11–12.)

The plaintiff alleges that she called JMG on April 2, 1998 and that Marks informed the plaintiff that she had been outbid for 12A because someone else offered to pay $1,246.00 per month. The plaintiff allegedly informed Marks that she was willing to pay that amount for 12A and that Marks then insisted that 12A was not available. (Hughes Aff. ¶ 13.) The plaintiff allegedly pressed Marks about why he had originally offered her the apartment to which Marks allegedly responded by saying he though the plaintiff was "Eva from Russia." (Hughes Aff. ¶ 14.) Marks allegedly told the plaintiff that 6G would be available on May 1, 1998, for $1,300–1,400 per month and that the rent was being raised due to needed repairs. The plaintiff alleges that she told Marks that she was willing to rent 6G. (Hughes Aff. ¶ 14.) The Solil defendants allege that Solil informed Marks that 12A had been rented to someone other than the plaintiff on April 3, 1998. (Solil Defs.' 56.1 St. ¶ 12.)

The plaintiff alleges that on April 2, 1998, a JMG representative, identified as Anatoliy, came to the plaintiff's office to give her another application to complete for 6G. (Hughes Aff. ¶ 19.) Although the application is dated April 1, 1998, the plaintiff alleges that she filled it out on April 2, 1998. (Hughes Aff. ¶ 19 & Ex. E.) The plaintiff asserts that on April 3, 1998, she called JMG and spoke to Anatoliy, who stated that he had submitted the plaintiff's second application to the Solil defendants. (Hughes Aff. ¶ 20.)

On April 13, 1998, Marks allegedly informed the plaintiff over the telephone that neither 12A nor 6G were available. (Hughes Aff. ¶ 21.) The plaintiff alleges that within minutes of the conversation between the plaintiff and Marks, Jessica Daugherty, a Caucasian co-worker, called JMG and Marks told Ms. Daugherty that both 12A and 6G were available and invited her to view the apartments and fill out an application. (Hughes Aff. ¶ 21; Affidavit of Jessica Daugherty sworn to August 4, 2000, attached to Pl.'s JMG 56.1 Counter–St. ("Daugherty Aff."), ¶¶ 1–4.) The Solil defendants allege that both 12A and 6G were rented to other people. (Solil Defs.' 56.1 St. ¶¶ 21, 24.)

On April 14, 1998, the plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") against JMG, which was assigned NYSDHR Case No. 1A–H–R–98–2305834

("April NYSDHR Complaint"). (Hughes Aff. Ex. F.) On May 11, 1998, the plaintiff and JMG entered into the Conciliation Agreement that was ordered by NYSDHR on May 21, 1998.[3] (Hughes Aff. Ex. G.) The Conciliation Agreement provides, among other things, that JMG agreed to "re-submit [the plaintiff's] application to [the Solil defendants] for a 1 bedroom apartment and write a letter to [the Solil defendants] on the [plaintiff's] behalf, ... follow up this letter with phone calls to [the Solil defendants] as an additional effort to place the [plaintiff], ... [and] to maintain a log of all telephone calls made to [the Solil defendants] of [sic] behalf of the [plaintiff]." (Hughes Aff. Ex. G, ¶ 7.) JMG also agreed to "make its best efforts to place the [plaintiff] in a 1 bedroom apartment in midtown Manhattan no farther east than 6th Avenue within the 30 day period" following May 11, 1998. (Hughes Aff. Ex. G, ¶ 8.) JMG interpreted the "best effort" language as requiring JMG to do "whatever was possible" to obtain an apartment for the plaintiff that met the specifications. (Pl.'s Supp. 56.1 Counter St. ¶ 1; JMG Supp. 56.1 St. ¶ 38.) The plaintiff agreed, upon issuance of the order from NYSDHR accepting the Conciliation Agreement, to withdraw with prejudice the charges filed with NYSDHR against JMG and accept the terms of the agreement "in full and complete satisfaction of any and all claims which the [plaintiff] now has or may have had against [JMG] arising out of the facts alleged in the complaint." (Hughes Aff. Ex. G, ¶¶ 4–5.)

JMG did not place the plaintiff in an apartment within the thirty-day period specified in the Conciliation Agreement. (Hughes Aff. ¶ 28.) JMG's attorney, Kenneth Sternberg, sent three letters to Solil on the plaintiff's behalf between May 15, 1998 and July 13, 1998. (Pl.'s Supp. 56.1 Counter–St. ¶ 4; JMG Supp. 56.1 St. ¶ 33; JMG's Ex. F.) JMG's owner, Jonathan Gruber and Mr. Sternberg also made phone calls to Solil during this period, although the number of phone calls is in dispute. (Pl.'s Supp. 56.1 Counter–St. ¶ 3; JMG Supp. 56.1 St. ¶ 33; JMG's Ex. G.) The Solil defendants allege that an application was submitted to Lillian Goldman on the plaintiff's behalf for her review in connection with apartment 12B at 145 West 55th Street, but the apartment was ultimately rented to a person with an income considerably greater than the plaintiff's income. (Solil Defs.' 56.1 St. ¶ 26; Solil Defs.' Ex. F.) The plaintiff alleges that JMG never advised the plaintiff about the availability of Apartment 12B. (Deposition Transcript of Eva Hughes dated September 28, 2000 ("Hughes Dep."), at 66–67.) The plaintiff alleges that the only apartment ever offered by JMG to the plaintiff pursuant to the Conciliation Agreement was a studio apartment. (Hughes Dep. at 65–66.)

On August 12, 1998, the plaintiff filed a complaint with NYSDHR against Solil, which was assigned NYSDHR Case No. 1B–H–R–98–4603943 ("August NYSDHR Complaint"). (Hughes Aff. Ex. H.) On March 29, 1999, the plaintiff filed an amended complaint in NYSDHR Case No. 1B–H–R–98–4603943 adding JMG, Lillian Goldman, and The Lillian Goldman Family L.L.C. as respondents ("Amended August NYSDHR Complaint"). (Hughes Aff. Ex. I.) The complaint charged the defendants with unlawful discriminatory practices under the HRL and charged JMG with breach of the Conciliation Agreement.

**3.** The NYSDHR Case number on the Conciliation Agreement is 1B–H–R–98–2305834.

(Hughes Aff. Ex. G.)

(Hughes Aff. Ex. I, ¶¶ 74–85.) On or about July 7, 1999, the plaintiff requested an administrative convenience dismissal from NYSDHR for NYSDHR Case No. 1B–H–R–98–4603943 in order to file a case in federal court. (Solil Defs.' 56.1 St. ¶ 39; Pl.'s Solil 56.1 Counter–St. ¶ 39.) NYSDHR granted an administrative convenience dismissal for NYSDHR Case No. 1B–H–R–98–4603943 on July 29, 1999. (Plaintiff's Response to Court Order dated March 29, 2001 ("Pl.'s Resp."), Ex. B.)

### III

#### A.

JMG first moves to dismiss the plaintiff's Sixth Cause of Action for failure to state a claim. In the Sixth Cause of Action, the plaintiff argues that JMG never intended to comply with the terms of the Conciliation Agreement and fraudulently induced the plaintiff to enter the Conciliation Agreement and therefore the Conciliation Agreement is null and void. More specifically, the plaintiff alleges that JMG never intended to make the promised efforts to obtain an apartment for the plaintiff as promised in paragraphs 7 and 8 of the Conciliation Agreement. These allegations of fraud, however, are not a basis for avoiding enforcement of the Conciliation Agreement.

In New York, a claim for fraud consists of the following elements: (1) a material false representation or omission of an existing fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance; (5) and damages. *See New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 768–769 (N.Y.1995); *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179, 1184 (1995); *see also Sudul v. Computer Out-*

*sourcing Services*, 917 F.Supp. 1033, 1043 (S.D.N.Y.1996). The mere allegation that a party to a contract did not intend to perform an express contractual promise does not state a claim for fraud. *See, e.g., Village On Canon v. Bankers Trust Co.*, 920 F.Supp. 520, 531 (S.D.N.Y.1996); *PI, Inc. v. Quality Prods., Inc.*, 907 F.Supp. 752, 761–62 (S.D.N.Y.1995) (collecting New York cases). However, it is also true that "[a] false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *Graubard Mollen Dannett & Horowitz*, 629 N.Y.S.2d 1009, 653 N.E.2d at 1184. "Any apparent tension between the two aforementioned principles of New York law has been reconciled through a rule, widely adopted by the state and federal courts, pursuant to which a false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties." *International CableTel Inc. v. Le Groupe Videotron Ltee*, 978 F.Supp. 483, 487 (S.D.N.Y.1997) (internal citation omitted). Accordingly, the Court of Appeals for the Second Circuit has stated that, "to maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract ...; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, *see Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) ...; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages ...." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996). *See also Four Finger Art Factory, Inc. v. DiNicola*, No. 99 Civ. 1259, 2000 WL 145466, at *4 (S.D.N.Y. Feb 9,

2000); *Turnbull v. Kling*, No. 98 Civ. 5925, 1999 WL 672561, at *4 (S.D.N.Y. Aug. 26, 1999); *Rays Trading (H.K.) Co. v. Judy–Philippine, Inc.*, No. 98 Civ. 0170, 1998 WL 355422, at *2 (S.D.N.Y. July 2, 1998).

■ Here, it is clear that the plaintiff's claim for fraudulent inducement relies on allegations that are not collateral to the Conciliation Agreement. Rather, the plaintiff has simply alleged that JMG did not intend to carry out the specific provisions of the Conciliation Agreement. The Conciliation Agreement provides that JMG agreed to re-submit the plaintiff's application to the Solil defendants, write a letter on the plaintiff's behalf, follow up the letter with phone calls, maintain a log of all telephone calls made to the Solil defendants, and to make its "best effort" to place the plaintiff in a suitable one bedroom apartment. (Hughes Aff. Ex. G, ¶¶ 7–8.) The plaintiff alleges that JMG made false representations because it did not make a legitimate, good-faith effort to contact the Solil defendants in an effort to place the plaintiff in an apartment and did not exercise best efforts to place the plaintiff in a suitable apartment. (Am. Compl.75–76.) There is nothing about the plaintiff's allegations with respect to JMG's efforts to place the plaintiff in an apartment that raise any alleged misrepresentation or fraudulent conduct going beyond what is contained in these provisions of the Conciliation Agreement.[4] Adding an allegation that JMG did not intend to perform its obligations under the Conciliation Agreement does not state a claim of fraud. *See Four Finger Art Factory, Inc.*,

2000 WL 145466, at *4 (dismissing claim for fraudulent inducement based on alleged misrepresentations specifically covered by contract); *Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F.Supp. 1012, 1016 (E.D.N.Y.1996) (holding that fraud claim which duplicates breach of warranty of merchantability fails to state a cause of action), *aff'd*, 125 F.3d 845 (2d Cir.1997); *J.E. Morgan Knitting Mills, Inc. v. Reeves Brothers, Inc.*, 243 A.D.2d 422, 663 N.Y.S.2d 211 (1997) (holding that claim that warranty as to liabilities on property was false does not state a cause of action for fraud). The plaintiff points to no violation of any other legal duty separate from the Conciliation Agreement or any damages not recoverable as contract damages. The allegations of fraud therefore do not state a claim and are not a basis for the plaintiff to avoid the enforcement of the Conciliation Agreement.[5]

### B.

JMG next argues that the Conciliation Agreement precludes the plaintiff from asserting her charges of housing discrimination against JMG. In the first four causes of action, the plaintiff charges JMG and the other defendants with having discriminated against her in violation of the FHA and state and local laws. JMG asserts that the plaintiff is limited to an action seeking to enforce the terms of the Conciliation Agreement and that the first four causes of action against JMG are barred by the explicit terms of the Conciliation Agreement.

■ The Conciliation Agreement between JMG and the plaintiff constitutes a

---

4. The plaintiff has asserted a claim in the Fifth Cause of Action under N.Y. Exec. Law § 296(8), which states that "[i]t shall be an unlawful discriminatory practice for any party to conciliation agreement ... to violate the terms of such agreement."

5. In light of the foregoing, it is not necessary to decide whether the fraud claim also fails because it fails to plead the elements of fraud with sufficient particularity under Fed. R.Civ.P. 9(b).

settlement of the plaintiff's claims of housing discrimination alleged against JMG in the April NYSDHR Complaint. *See, e.g., State Division of Human Rights v. County of Onondaga,* 50 A.D.2d 716, 374 N.Y.S.2d 871, 872 (1975) (noting that a conciliation agreement between the petitioner and respondent was a settlement of the petitioner's employment discrimination claims). Under New York Law, "[a] settlement is a contract, and once entered into is binding and conclusive." *Janneh v. GAF Corp.,* 887 F.2d 432, 436 (2d Cir. 1989). "Settlement agreements are strongly favored in New York and may not be lightly cast aside. Afterthought or change of mind are not sufficient to justify rejecting a settlement." *Willgerodt v. Hohri,* 953 F.Supp. 557, 560 (S.D.N.Y. 1997) (citations omitted), *aff'd,* 159 F.3d 1347 (2d Cir.1998). In New York, a settlement agreement is construed according to general principles of contract law. *See Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 661 (2d Cir.1994).

▆▆▆▆ The initial interpretation of the settlement agreement is a matter of law for the court to decide. *See K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996). The Court must construe the agreement in accordance with the intent of the parties, giving unambiguous words their plain meaning. *See Bank of New York,* 35 F.3d at 661. If the agreement is unambiguous, the court is "required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998); *K. Bell & Assocs.,* 97 F.3d at 637. In construing the agreement, the Court should

also reach for fair and reasonable results. *See Bank of New York,* 35 F.3d at 662.

Here, the terms of the Conciliation Agreement are unambiguous. The Conciliation Agreement provides that upon the issuance of an order from NYSDHR accepting the Conciliation Agreement, the plaintiff "agrees to withdraw with prejudice the charges filed against" JMG with NYSDHR in the April NYSDHR Complaint. (Hughes Aff. Ex. G, ¶ 4.) The agreement also provides that the plaintiff "accepts the terms of this agreement in full and complete satisfaction of any and all claims which the [plaintiff] now has or may have had against [JMG] arising out of the facts alleged in the [April NYSDHR Complaint]." (Hughes Aff. Ex. G, ¶ 5.) The Conciliation Agreement was subject to an order from NYSDHR embodying the terms of the agreement and thus the plaintiff's charges were withdrawn with prejudice. (Hughes Aff. Ex. G.) The plaintiff's allegations with respect to her First through Fourth Causes of Action in this case arise out of the same set of facts alleged in the plaintiff's April NYSDHR Complaint.

The plaintiff argues that because JMG violated the terms of the Conciliation Agreement the underlying charges of discrimination set forth in the plaintiff's Amended Complaint are actionable, relying on N.Y. Exec. Law § 296(8). N.Y. Exec. Law § 296(8) provides that "[i]t shall be an unlawful discriminatory practice for any party to a conciliation agreement made pursuant to [the HRL] to violate the terms of such agreement." N.Y. Exec. Law § 296(8). Although this provision of the HRL provides that the breach of a conciliation agreement itself is an actionable discriminatory practice, N.Y. Exec. Law § 296(8) does not provide that where a conciliation agreement is allegedly breached a party may revive the underly-

ing discrimination claims resolved by the conciliation agreement. Thus, although the plaintiff still has a claim under N.Y. Exec. Law § 296(8), for breach of the Conciliation Agreement, which she asserts in her Fifth Cause of Action, in accordance with the plain language of the Conciliation Agreement, the plaintiff's First through Fourth Causes of Action are dismissed as against JMG.[6]

## C.

Finally, JMG asserts that, with respect to the remaining claim against JMG, the plaintiff's Fifth Cause of Action, it is entitled to summary judgment. In her Fifth Cause of Action, the plaintiff alleges that JMG breached paragraphs 7 and 8 of the Conciliation Agreement in violation of N.Y. Exec. Law § 296(8). (Am.Compl.¶¶ 51, 71.) JMG asserts that, as a matter of law, it complied with the specific requirements set forth in the Conciliation Agreement.

N.Y. Exec. Law § 296(8) provides that it shall be an unlawful discriminatory practice for any party to a conciliation agreement to violate its terms. Paragraph 7 of the Conciliation Agreement provides, among other things, that JMG agreed to "re-submit [the plaintiff's] application to [the Solil defendants] . . . and write a letter to [the Solil defendants] on the [plaintiff's] behalf, . . . follow up this letter with phone calls to [the Solil defendants] as an additional effort to place the [plaintiff], . . . [and] to maintain a log of all telephone

calls made to [the Solil defendants] of [sic] behalf of the [plaintiff]." (Hughes Aff. Ex. G, ¶ 7.) Paragraph 8 provides that JMG agreed to "make its best efforts to place the [plaintiff] in a 1 bedroom apartment in midtown Manhattan no farther east than 6th Avenue within the 30 day period" following May 11, 1998. (Hughes Aff. Ex. G, ¶ 8.) Although JMG asserts that it complied with the requirements of paragraphs 7 and 8, the plaintiff has raised genuine issues of material fact as to whether JMG violated paragraphs 7 and 8 of the Conciliation Agreement, in particular, whether JMG made its "best effort" to place the plaintiff in a suitable apartment during the thirty-day period specified in the Conciliation Agreement. *See Dogwood Assoc., L.P. v. Douglas Elliman–Gibbons & Ives, Inc.*, No. 91 Civ. 7895, 1993 WL 361655, at *4 (S.D.N.Y. Sept. 14, 1993) (concluding that whether the defendant used its "best efforts" to effect renewals of leases presented a triable issue of fact); *Philip Morris, Inc. v. Sega Enterprises, Inc.*, No. 91 Civ. 1292, 1992 WL 18804, at *2 (S.D.N.Y. Jan. 28, 1992) (denying summary judgment where there were genuine issues of material fact as to whether the defendant used its "best effort" under a settlement agreement). Thus, JMG's motion for summary judgment is denied.

## IV.

Defendant Marks moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c). Marks argues that the plaintiff's claims against him are barred by res judicata

---

**6.** It is unnecessary to reach JMG's alternative argument that the plaintiff's federal claims are also barred by 42 U.S.C. § 3613(a)(2), which provides that an aggrieved person may not commence a civil action under the FHA "if the Secretary [of Housing and Urban Development ("HUD")] or a State or local agency has obtained a conciliation agreement with the consent of an aggrieved person," except for the purpose of enforcing the terms of the

agreement. The parties dispute whether a conciliation agreement entered into by the NYSDHR is covered by this provision. *See, e.g., United States v. Jenkins*, 175 F.R.D. 257, 261 (E.D.Mich.1997) (finding that a settlement agreement between the plaintiff, certain defendants and the Michigan Department of Civil Rights was not a "conciliation agreement" under the FHA because HUD was not involved).

because the plaintiff raised all of her current claims or could have raised them in the prior NYSDHR complaint.[7] Res judicata bars "subsequent litigation of any ground of recovery that was available in the prior action, whether or not it was actually litigated or determined." *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 62 (2d Cir.1989); *accord Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994); *Greenberg v. Board of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir.1992). It acts to protect "litigants from the burden of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore, Inc.*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Res judicata ensures the conclusiveness of judgments and thus "secure[s] the peace and repose of society by the settlement of matters capable of judicial determination." *Nevada v. United States*, 463 U.S. 110, 129, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (internal quotation omitted).

 A federal court must give the same preclusive effect to a state court decision as a state court would give it. *See* 28 U.S.C. § 1738; *Brooks v. Giuliani*, 84 F.3d 1454, 1463 (2d Cir.1996); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir.1994) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)); *Hennessy v. Cement and Concrete Worker's Union Local 18A*, 963 F.Supp. 334, 337–38 (S.D.N.Y. 1997). Thus, the binding effect on this Court of the proceedings in the plaintiff's prior NYSDHR proceeding is governed by New York res judicata doctrine. Under New York law, the transactional approach to res judicata prevents parties to the pri-

or action or those in privity with them "from raising in a subsequent proceeding any claim they could have raised in the prior one, where all of the claims arise from the same underlying transaction." *Schulz*, 44 F.3d at 53 (citing *Reilly v. Reid*, 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978)); *accord Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir.1997); *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir.1997) (collecting New York cases); *Brooks*, 84 F.3d at 1463 (citing *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158, 1159 (1981)); *Hennessy*, 963 F.Supp. at 338; *Smith v. Russell Sage College*, 54 N.Y.2d 185, 445 N.Y.S.2d 68, 429 N.E.2d 746, 749 (1981). New York courts have held that res judicata principles are not to be applied "mechanically;" rather "the analysis requires consideration of the 'realities of the litigation.'" *Nat'l Fuel Gas Distribution Corp. v. TGX Corp.*, 950 F.2d 829, 839 (2d Cir.1991) (quoting *Staatsburg Water Co. v. Staatsburg Fire Dist.*, 72 N.Y.2d 147, 531 N.Y.S.2d 876, 527 N.E.2d 754, 756 (1988)(quotations omitted)).

 The plaintiff first argues that res judicata does not bar this action against Marks because the Conciliation Agreement ordered by NYSDHR withdrawing the plaintiff's claims with prejudice was not an adjudication on the merits for res judicata purposes. However, under New York law, a discontinuance with prejudice, including one pursuant to a settlement, constitutes a final judgment on the merits for purposes of res judicata. *See NBN Broadcasting, Inc. v. Sheridan Broadcasting Networks, Inc.*, 105 F.3d 72, 78 (2d Cir.1997); *Oak Beverages, Inc. v. Tomra of Massachusetts, L.L.C.*, 96 F.Supp.2d 336, 351 (S.D.N.Y.2000); *Fiore*

---

7. Marks also argued that the plaintiff's Sixth Cause of Action for fraudulent inducement does not state a claim. As discussed above, this claim is dismissed for failure to state a claim upon which relief can be granted.

v. *The City of New York,* No. 97 Civ. 4935, 1998 WL 755134, at *1 (S.D.N.Y. Oct. 26, 1998) (settlement of a New York State Division of Human Rights complaint acts as a final judgment on the merits); *Moore v. County of Clinton,* 219 A.D.2d 131, 640 N.Y.S.2d 927, 929 (1996); *Forte v. Kaneka America Corp.,* 110 A.D.2d 81, 493 N.Y.S.2d 180, 182 (1985) (applying res judicata to a written stipulation of discontinuance "with prejudice on the merits"). As Professor Siegal explained: "The stipulation or order of discontinuance, however, if that is the method used, may specify that is to be on the merits, or 'with prejudice' (or any other equivalent terminology), and it will then have res judicata effect in future litigation on the same cause." McKinney's Cons.Laws of N.Y., Book 7B CPLR C 3217:15, p. 735–36 (1992).[8]

In this case, the parties voluntarily entered into the Conciliation Agreement, which provided that the plaintiff would withdraw with prejudice the charges filed in the April NYSDHR Complaint upon the issuance of an order of NYSDHR accepting the agreement. NYSDHR issued the order and the charges contained in the plaintiff's April NYSDHR Complaint were withdrawn with prejudice. Thus, there was a final adjudication on the merits such that the doctrine of res judicata may apply.

 The fact that the parties entered into the Conciliation Agreement as a result of administrative proceedings and that NYSDHR, rather than a court, issued the order accepting the agreement does not bar application of the doctrine of res judi-

cata to the plaintiff's remaining claims against Marks. Under New York law:

> [T]he doctrine[ ] of res judicata ... [is] applicable to give conclusive effect to the quasi-judicial determinations of administrative agencies ... when rendered pursuant to the adjudicatory authority of the agency to decide cases brought before its tribunal employing procedures substantially similar to those used in a court of law.

*Staatsburg Water Co.,* 531 N.Y.S.2d 876, 527 N.E.2d at 756 (quoting *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 489–90 (1984)); *see also Nat'l Fuel,* 950 F.2d at 838. The Court of Appeals for the Second Circuit has found that proceedings before the NYSDHR provide parties a full and fair opportunity to litigate their claims and constitute an adjudicatory process with procedures substantially similar to those used in a court of law, such that NYSDHR determinations have preclusive effect even when not reviewed by a state court. *See Kirkland v. City of Peekskill,* 828 F.2d 104, 108–109 (2d Cir.1987); *see also Mitchell v. Nat'l Broadcasting Co.,* 553 F.2d 265, 270–71 (2d Cir.1977). The parties entered into the Conciliation Agreement during the course of quasi-judicial NYSDHR proceedings and the agreement is analogous to a withdrawal with prejudice entered into during the course of litigation in a court of law. The plaintiff in this case has offered no evidence that she was denied a full and fair opportunity to litigate her claims before the NYSDHR and the fact that the plaintiff did not have a formal hearing before the NYSDHR does not deprive the

---

8. While the plaintiff cites *Ott v. Barash,* 109 A.D.2d 254, 491 N.Y.S.2d 661 (1985) for the proposition that a settlement and release is not entitled to res judicata effect, there is no discussion in that case of the res judicata effect of an order of withdrawal or discontinuance of an action with prejudice, which is

the situation in this case, and which the cases and commentary have concluded is entitled to res judicata effect. *See also Dalessandro v. Monk,* 864 F.2d 6, 8 (2d Cir.1988) (withdrawal of EEOC and NYSDHR charges precluded subsequent federal complaint on the same charges).

Conciliation Agreement of its preclusive effect. *See Fiore,* 1998 WL 755134, at *1.

■ The plaintiff also argues that Marks cannot successfully invoke the res judicata doctrine because Marks was not a party, and was not in privity with a party, in the NYSDHR proceedings concerning the April NYSDHR Complaint. Under New York state law, privity is an amorphous concept not easily applied and the term does not have a technical and well-defined meaning. *Watts v. Swiss Bank Corp.,* 27 N.Y.2d 270, 317 N.Y.S.2d 315, 265 N.E.2d 739, 743 (1970). In general, to establish privity between parties, the connection between the parties must be such that the interests of the party that was not present in the prior proceeding can be said to have been represented in the prior proceeding. *See Green v. Santa Fe Industries, Inc.,* 70 N.Y.2d 244, 519 N.Y.S.2d 793, 514 N.E.2d 105, 108 (1987); *Watts,* 317 N.Y.S.2d 315, 265 N.E.2d at 743. Here, the plaintiff's allegations of discriminatory housing practices contained in her April NYSDHR Complaint all concerned the alleged actions of Marks on behalf of JMG and the interests of JMG in the NYSDHR proceedings and in entering into the Conciliation Agreement were closely aligned to the interests of Marks. Thus, there is privity between JMG and Marks for purposes of res judicata.

In this case, the plaintiff's housing discrimination claims against Marks are simply variants of the claims that were raised in the plaintiff's April NYSDHR Complaint and were resolved by the Conciliation Agreement. The plaintiff seeks to hold Marks liable for the very same claims that she previously raised against JMG and for which JMG can only be liable based on the conduct of Marks. The

plaintiff withdrew those very claims with prejudice and thus those claims are barred by res judicata and are dismissed against Marks.[9]

## V.

The Solil defendants move for summary judgment pursuant to Fed.R.Civ.P. 56 to dismiss the discrimination claims alleged against them under the Fair Housing Act, the HRL and the NYCHRL. The Solil defendants argue that the plaintiff has failed to produce sufficient evidence to support a finding that the Solil defendants engaged in discriminatory housing practices.

■ The burden shifting procedure employed in examining a housing discrimination claim under the Fair Housing Act follows the standards established in Title VII discrimination cases. *See Robinson v. 12 Lofts Realty,* 610 F.2d 1032, 1036–43 (2d Cir.1979) (applying *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to Fair Housing Act claim); *see also Cabrera v. Jakabovitz,* 24 F.3d 372, 383 (2d Cir.1994); *Soules v. United States Department of Housing and Urban Development,* 967 F.2d 817, 822 (2d Cir.1992). To make out a prima facie case of housing discrimination, a plaintiff must establish that: (1) she is a member of a protected class; (2) she applied for and was qualified for the housing opportunity; (3) she was rejected; and (4) the housing opportunity remained available. *See Robinson,* 610 F.2d at 1038; *see also Cabrera,* 24 F.3d at 381; *Walker v. Cox,* No. 95 Civ. 1219, 1997 WL 177854, at *3 (E.D.N.Y. Mar. 27, 1997). In stating a claim under the Fair Housing Act a plaintiff need allege "only discriminatory effect,

---

9. Like JMG, Marks also argues that the federal claims against him are barred by 42 U.S.C. § 3613(a)(2) based on the preclusive effect of the Conciliation Agreement. It is unnecessary to reach that statutory argument.

and need not show that the decision complained of was made with discriminatory intent." *Soules,* 967 F.2d at 822 (quoting *United States v. Yonkers Board of Education,* 837 F.2d 1181, 1217 (2d Cir.1987)); *Robinson,* 610 F.2d at 1036.

Once a prima facie case is established, "the burden shifts to the defendant to come forward with evidence to show that his [or her] actions were not motivated by considerations of race." *Robinson,* 610 F.2d at 1039; *see also Soules,* 967 F.2d at 822. After the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that race was. *See id.* at 822; *Robinson,* 610 F.2d at 1040. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997).

The parties do not dispute that the plaintiff is African–American nor do they dispute that she sought and was qualified for Apartments 12A and 6G and that she was not offered the apartments. The Solil defendants argue, however, that the plaintiff did not establish her prima facie case because the Solil defendants were not aware that the plaintiff belonged to a protected class. Although there is no evidence in the record that the Solil defendants knew of the plaintiff's protected status, the plaintiff contends that Marks, in his role as a real estate broker with JMG, served as an agent of the Solil defendants and that Marks's knowledge may be imputed to the Solil defendants.[10] The Solil defendants argue that Marks and JMG were independent contractors and were not agents of the Solil defendants.

To establish an agency relationship under New York law, a party must show "the manifestation by the principal that the agent shall act for him[;] the agent's acceptance of the undertaking[;] and the understanding of the parties that the principal is to be in control of the undertaking." *Cabrera v. Jakabovitz,* 24 F.3d 372, 386 (2d Cir.1994) (quoting Restatement (Second) of Agency § 1 cmt. b (1958)); *see also* 2A N.Y. Juris.2d, Agency § 2 (1998). Whether an agency relationship exists under this standard is a mixed question of law and fact. *Cabrera,* 24 F.3d at 385–86. Summary judgment is appropriate if the material facts from which an agency may be inferred are not in dispute or where the facts will reasonably support only one reasonable conclusion. *See Cabrera,* 24 F.3d at 386 & n. 14. In general, the knowledge acquired by an agent acting within the scope of the agency is imputed to the agent's principal. *See* 2A N.Y. Juris.2d, Agency § 296 (1998); *see also Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828, 829 (1985).

In *Cabrera,* the Court of Appeals for the Second Circuit found that there was suffi-

---

**10.** The plaintiff also argues that an inference can be drawn that the Solil defendants were aware of the plaintiff's race because Marks was aware of the plaintiff's race and Marks had personal telephone conversations with the Solil defendants about the plaintiff's appli-cations. Such an inference, however, would be mere speculation and is insufficient to establish that the Solil defendants were aware of the plaintiff's race. *See Martin v. Citibank,* 762 F.2d 212, 217 (2d Cir.1985).

cient evidence to conclude that a principal-agent relationship existed between a certain landlords and a real estate brokerage firm. *Cabrera,* 24 F.3d at 386–388. In finding sufficient evidence of the existence of an agency relationship, the court relied on evidence regarding the relationship between the brokerage firm and the landlords, including, among other things, that: the landlords supplied the brokerage firm with listings of vacant apartments with the understanding that the brokerage firm would refer prospective tenants; the landlords expected the brokerage firm to refer only prospective tenants who met specific income requirements and the landlords' criteria for the number of persons would occupy the apartment; the landlords provided the brokerage firm with rental applications; the brokerage firm would often deliver completed applications to the landlord; leases were sometimes signed in the brokerage firm's office; the brokerage firm contacted the applicant to notify him or her as to the status of the application or to answer any questions regarding the lease; the brokerage firm would accept rent and security deposits on the landlord's behalf, and the brokerage firm's brokers admitted that they acted as the landlords' agents, although some of these admissions were contradicted. *See id.* at 386–87. The Court of Appeals also noted that the landlords could control the brokers by cutting them off if they referred unacceptable tenants. *See id.* at 387.

█ In this case, the plaintiff has pointed to numerous facts similar to those relied upon by the *Cabrera* court that establish that there is a genuine issue for trial with respect to the existence of an agency relationship between Marks, through his broker position at JMG, and the Solil defendants such that Marks's knowledge of the plaintiff's race my be imputed to the Solil defendants. The

plaintiff asserts that Solil provides the brokers who work with them information regarding apartment availability, either orally or through the distribution of a list which it produces bi-weekly. (Pl.'s Solil 56.1 Counter–St. ¶ 63.) In addition, there is no dispute that when an applicant uses the services of a broker, the broker submits the application along with all the necessary paperwork to Solil and if the applicant is accepted, the broker has leases prepared, has the individual execute the lease, and then submits the lease to Solil to be countersigned. (Solil Defs.' 56.1 St. ¶ 29–30; Pl.'s Solil 56.1 Counter–St. ¶ 30.) On many occasions, Marks would deliver completed applications by hand to the Solil defendants' offices. (Deposition of Richard Marks dated September 8, 2000 ("Marks Dep."), at 47.) The Solil defendants also allegedly had standards and guidelines with respect to the income and credit history of prospective tenants, which were understood by brokers they worked with, such as Marks. (Affidavit of Deneane Dunlop sworn to December 6, 2000 ("Dunlop Aff."), ¶¶ 6–7; Affidavit of Jane Goldman sworn to December 6, 2000 ("Goldman Aff."), ¶ 6; Marks Dep. at 61–62.) There is also evidence that employees of the Solil defendants do not meet prospective tenants prior to the lease signing and that, in general, the tenant either signs the lease in the broker's office or the tenant's office rather than at the Solil defendants' office. (Affidavit of Ronald Van Wickler sworn to December 7, 2000 ("Van Wickler Aff."), ¶ 11; Affidavit of Michele Weinberg sworn to December 7, 2000 ("Weinberg Dec. Aff."), ¶ 12.) Thus, drawing all reasonable inferences in favor of the plaintiff, it cannot be said that a rational fact finder would necessarily conclude that an agency relationship between Marks, through his broker position at JMG, and the Solil defendants did not exist, such that Marks' knowledge of the plaintiff's

race cannot be imputed to the Solil defendants rendering summary judgment inappropriate.

■ The Solil defendants also assert that the plaintiff has not established the fourth prong of the prima facie case. The Solil defendants contend that 12A was designated "Switch" on Solil's vacancy list, meaning that the Solil defendants designated the apartment to be rented to a tenant who would be switching from another apartment owned by the Solil defendants. They assert that 6G was designated "Hold" on the vacancy list, meaning that the Solil defendants designated that the apartment was not to be rented on the market because the apartment was intended to be rented to a friend of Jane Goldman, an officer of Solil. Thus, they argue that both 12A and 6G were unavailable at the time that the plaintiff applied for the apartments. There is evidence, however, that Marks informed the plaintiff at various times that 12A and 6G were available and the superintendent of the building showed the plaintiff both apartments. In addition, the plaintiff argues that on April 13, 2000, after the plaintiff had allegedly been informed by Marks that she was rejected for the apartments, her former co-worker Jessica Daugherty was informed by Marks that both 12A and 6G were available. (Hughes Aff. ¶ 21; Daugherty Aff. ¶ 3–5.) In addition, there are discrepancies concerning the dates on which the tenants who eventually leased 12A and 6G applied for the apartments and actually signed the leases for 12A and 6G creating issues of fact as to whether the apartments were available at the time the plaintiff applied for them and whether they remained available after the plaintiff was rejected. (Hughes Aff. Ex. C & D; Deposition of Michele Weinberg dated September 19, 2000 ("Weinberg Dep."), at 47–49, 52.) Thus, drawing all inferences in favor of the plaintiff, there is a dispute as to the facts surrounding the availability of 12A and 6G and whether the plaintiff has established a prima facie case of discrimination.

The Solil defendants assert that, assuming the plaintiff has established a prima facie case of discrimination, Solil has demonstrated legitimate nondiscriminatory reasons for their actions and the plaintiff has failed to demonstrate that these reasons are pretextual. The Solil defendants argue that 12A was rented to an existing Solil tenant because the Solil defendants could then collect rental increases on two apartments rather than one. The Solil defendants contend that they did not rent 6G to the plaintiff because it was reserved for a personal friend of Jane Goldman, an officer of Solil. However, as discussed above, the plaintiff contends that Marks informed the plaintiff that both apartments were available despite the Solil defendants' assertions that the apartments were marked "Switch" and "Hold." In addition Marks allegedly informed the plaintiff's former co-worker that both apartments were available after the plaintiff was informed that they had been rented to other applicants. There are also discrepancies between the dates of the applications submitted by the tenants selected for 12A and 6G and the dates the leases were executed. There is a factual dispute regarding the Solil defendants' reasons for renting 12A and 6G to other applicants and, drawing all inferences in favor the plaintiff, a rational fact finder could, on the current record, find that the Solil defendants' explanation is pretextual and that the plaintiff's applications for 12A and 6G were rejected for discriminatory reasons. Thus, the Solil defendants' motion for summary judgment

is denied.[11]

### Conclusion

For the reasons explained above:

1. Defendant JMG's motions to dismiss the Amended Complaint pursuant to Fed. R.Civ.P. 12(b)(6) and for summary judgment pursuant to Fed.R.Civ.P. 56 is granted in part and denied in part. It is granted as to the First through Fourth Causes of Action and the Sixth Cause of Action, which are dismissed with prejudice; it is denied as to the Fifth Cause of Action.

2. Defendant Marks's motion to dismiss the Amended Complaint against him pursuant to Fed.R.Civ.P. 12(c) is granted.

3. The Solil defendants motion for summary judgment pursuant to Fed.R.Civ.P. 56 is denied.

**SO ORDERED.**

---

11. Both the plaintiff and the Solil defendants did not address the plaintiff's claims under the HRL and the NYCHRL in their papers submitted on this motion. Stating a housing discrimination claim under the HRL or the NYCHRL, however, is substantially similar to stating a housing discrimination claim under the Fair Housing Act. *See Broome v. Biondi,* 17 F.Supp.2d 211, 216 (S.D.N.Y.1997). *Cf. Burger v. Litton Indus., Inc.,* No. 91 Civ. 918, 1996 WL 421449, at *18–19 (S.D.N.Y. Apr. 25, 1996). Thus, any motion for summary judgment with respect to those claims is denied as well.